TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
KEVIN J. BUTLER (Cal. Bar No. 329129)
Chief, Major Crimes Section
JENA A. MACCABE (Cal. Bar No. 316637)
Deputy Chief, Major Crimes Section
Assistant United States Attorneys
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6495/5046
    Facsimile: (213) 894-0141
    E-mail:   kevin.butler2@usdoj.gov
          jena.maccabe@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 25-CR-211-FLA-1, 2 |
| Plaintiff, | OMNIBUS OPPOSITION TO DEFENDANTS EUGENE HENLEY, JR. AND SYLVESTER ROBINSON'S MOTIONS TO DISMISS AND DEFENDANT EUGENE HENLEY, JR.'S MOTION TO STRIKE (DKT. 175, 180, 185, 188) |
| v. | |
| EUGENE HENLEY, JR., et al., | |
| Defendants. | Hearing Date: March 13, 2026 |
| | Hearing Time: 1:30 p.m. |
| | Location:    Courtroom of the Hon. Fernando Aenlle-Rocha |

Plaintiff United States of America, by and through its counsel of record, the First Assistant United States Attorney for the Central District of California and Assistant United States Attorneys Kevin J. Butler and Jena A. MacCabe, hereby files its opposition to defendants EUGENE HENLEY, JR. and SYLVESTER ROBINSON's motions to dismiss and

defendant EUGENE HENLEY, JR.'s motion to strike.  (See Dkt. 175, 180, 185, 188.)

This opposition is based on the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: February 19, 2026          Respectfully submitted,

TODD BLANCHE
Deputy Attorney General

BILAL A. ESSAYLI
First Assistant United States
Attorney

ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division


_____/s/_____
KEVIN J. BUTLER
JENA A. MACCABE
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

ii

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

TABLE OF AUTHORITIES..............................................i

MEMORANDUM OF POINTS AND AUTHORITIES..............................1

I.    INTRODUCTION...............................................1

II.   LEGAL STANDARD.............................................1

      A.    Motion to Dismiss....................................1

      B.    Motion to Strike....................................3

III.  DISCUSSION.................................................4

      A.    The RICO Count Should Not Be Dismissed nor Fragmented.....4

            1.    The RICO Count Satisfies the Form Required for
                  Indictment and the Evidence Required for
                  Conviction........................................5

            2.    HENLEY's Racketeering Activity Is Not
                  "Surplusage".....................................11

            3.    HENLEY Cannot Strike the Control Tactics He
                  Employed for the Success of His Enterprise..........16

            4.    The Jury Should See the Indictment Themselves.......17

      B.    Drug Robberies Are Federal Crimes....................18

      C.    ROBINSON, Not the Government, Committed RICO
            Conspiracy, Robbery, and Extortion....................20

IV.   CONCLUSION................................................24

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                  PAGE

**Cases**

Allwaste, Inc. v. Hecht,
  65 F.3d 1523 (9th Cir. 1995) ................................. 10, 11

Boyle v. United States,
  556 U.S. 938 (2009) ........................................... 8, 12

Cedric Kushner Promotions, Ltd. v. King,
  533 U.S. 158 (2001) ............................................... 7

Chandler v. Amsberry,
  2014 WL 1323048 (D. Or. Mar. 28, 2014) .......................... 22

Does 1-60 v. Republic Health Corp.,
  669 F. Supp. 1511 (D. Nev. 1987) ................................ 16

H.J. Inc. v. Nw. Bell Tel. Co.,
  492 U.S. 229 (1989) ............................................... 9

Hamling v. United States,
  418 U.S. 87 (1974) ................................................ 3

Russell v. United States,
  369 U.S. 749 (1962) ............................................... 6

Shayne v. United States,
  255 F.2d 739 (9th Cir. 1958) ..................................... 18

Taylor v. United States,
  579 U.S. 301 (2016) .............................................. 19

United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Const. Trades
  Dep't, AFL-CIO,
  770 F.3d 834 (9th Cir. 2014) ..................................... 22

United States v. Banks,
  514 F.3d 959 (9th Cir. 2008) ..................................... 12

United States v. Benny,
  786 F.2d 1410 (9th Cir. 1986) ..................................... 7

United States v. Bibbero,
  749 F.2d 581 (9th Cir. 1984) ..................................... 15

United States v. Bingham,
  653 F.3d 983 (9th Cir. 2011) ..................................... 14

i

United States v. Black,
  733 F.3d 294 (9th Cir. 2013) ..............................20, 21, 23

United States v. Bonanno,
  852 F.2d 434 (9th Cir. 1988) ......................................23

United States v. Boren,
  278 F.3d 911 (9th Cir. 2002) .......................................3

United States v. Capers,
  20 F.4th 105 (2d Cir. 2021) .......................................13

United States v. Cianci,
  378 F.3d 71 (1st Cir. 2004) ......................................5, 7

United States v. Coonan,
  938 F.2d 1553 (2d Cir. 1991) ......................................12

United States v. Critzer,
  951 F.2d 306 (11th Cir. 1992) .....................................16

United States v. Daniel,
  2010 WL 11507585 (C.D. Cal. 2010) ...............................3, 4

United States v. Diaz,
  248 F.3d 1065 (11th Cir. 2001) ....................................22

United States v. DiCesare,
  765 F.2d 890 ......................................................15

United States v. Farmer,
  38 F.4th 591 (7th Cir. 2022) ......................................13

United States v. Feldman,
  853 F.2d 648 (9th Cir. 1988) .......................................8

United States v. Fernandez,
  388 F.3d 1199 (9th Cir. 2004) .....................................16

United States v. Fiander,
  547 F.3d 1036 (9th Cir. 2008) ......................................7

United States v. Gerlay,
  2009 WL 3872143 (D. Alaska Nov. 17, 2009) .....................16, 17

United States v. Gonzalez,
  2018 WL 6834315 (D. Nev. Dec. 28, 2018) ........................3, 4

United States v. Gurolla,
  333 F.3d 944 (9th Cir. 2003) ......................................21

United States v. Johnson,
  262 F.R.D. 410 (D. Del. 2009) ...................................... 4

United States v. Kaplan,
  836 F.3d 1199 (9th Cir. 2016) ..................................... 5

United States v. Kelly,
  128 F.4th 387 (2d Cir. 2025) ..................................... 7

United States v. Kelly,
  874 F.3d 1037 (9th Cir. 2017) ................................. 2, 3

United States v. Kilpatrick,
  2013 WL 4029084 (E.D. Mich. Aug. 8, 2013) ........................ 6

United States v. Laurienti,
  611 F.3d 530 (9th Cir. 2010) ................................. 3, 16

United States v. Mancuso,
  718 F.3d 780 (9th Cir. 2013) ..................................... 2

United States v. Nukida,
  8 F.3d 665 (9th Cir. 1993) ....................................... 3

United States v. Polizzi,
  500 F.2d 856 (9th Cir. 1974) .................................... 18

United States v. R. P. Oldham Co.,
  152 F. Supp. 818 (N.D. Cal. 1957) ................................ 4

United States v. Redlightning,
  624 F.3d 1090 (9th Cir. 2010) ................................... 17

United States v. Resendiz-Ponce,
  549 U.S. 102 (2007) .............................................. 2

United States v. Rodriguez,
  360 F.3d 949 (9th Cir. 2004) ..................................... 3

United States v. Rodriguez-Gonzales,
  358 F.3d 1156 (9th Cir. 2004) .................................... 6

United States v. Rodriguez-Moreno,
  526 U.S. 275 (1999) ............................................. 13

United States v. Rone,
  598 F.2d 564 (9th Cir. 1979) .................................... 14

United States v. Root,
  366 F.2d 377 (9th Cir. 1966) ..................................... 4

iii

United States v. Scales,
  594 F.2d 558 (6th Cir. 1979) .................................... 18

United States v. Steed,
  465 F.2d 1310 (9th Cir. 1972) .................................. 18

United States v. Terrigno,
  838 F.2d 371 (9th Cir. 1988) .................................... 4

United States v. Turkette,
  452 U.S. 576 (1981) ............................................ 8

United States v. Utz,
  886 F.2d 1148 (9th Cir. 1989) .................................. 18

United States v. White,
  7 F.4th 90 (2d Cir. 2021) ..................................... 13

United States v. Williams,
  547 F.3d 1187 (9th Cir. 2008) .................................. 23

United States v. Woodberry,
  987 F.3d 1231 (9th Cir. 2021) .................................. 19

United States v. Zemek,
  634 F.2d 1159 (9th Cir. 1980) .................................. 15

Wong Tai v. United States,
  273 U.S. 77 (1927) ............................................. 2

**Statutes**

18 U.S.C. § 1951(a) ............................................. 23

18 U.S.C. § 1961(1) ...................................... 12, 14, 15

18 U.S.C. § 2421 ............................................... 14

18 U.S.C. § 3237 ............................................... 13

21 U.S.C. § 841(b)(1)(A) ....................................... 23

California Health and Safety Code § 11350(a) ................... 24

**Rules**

Fed. R. Crim. P. 7 ........................................... 2, 3

Fed. R. Crim. P. 12 ............................................. 2

iv

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant EUGENE HENLEY, JR. moves to dismiss the RICO conspiracy charge against him or, in the alternative, to strike overt acts pertaining to murder, sex trafficking, and fraud, like so many other organized crime bosses before him tried and failed over the 55 years since the enactment of the RICO Act.  (Dkt. 180.)[1]  HENLEY additionally moves to dismiss the robbery counts, despite acknowledging that Supreme Court precedent forecloses his argument.  (Dkt. 188.)  Defendant SYLVESTER ROBINSON moves to dismiss those counts too, as well as the extortion counts, essentially arguing that the government made him commit those crimes.  (Dkt. 175.)  HENLEY separately moves to strike his self-proclaimed alias "Anybody Killa" and the screenshot of his video boasting about extorting film crews from the indictment, although the jury will have the recordings themselves.  (Dkt. 185.)  Those motions are based on, at best, a sloppy reading of the law and the facts in this case and clearly demonstrate that HENLEY and ROBINSON are afraid of proceeding to trial on the current date.  The motions also share a common thread: they ask this Court to do what the law forbids: weigh evidence, make credibility determinations, and conduct mini-trials on individual allegations.  They should be denied.

**II.   LEGAL STANDARD**

**A.   Motion to Dismiss**

Defendants "may raise by pretrial motion any defense, objection, or request that the court can determine <u>without a trial on the</u>

---

[1] All docket citations that include a page number are to the page number listed in the ECF header.

merits." Fed. R. Crim. P. 12(b)(1) (emphasis added). This includes motions to dismiss for failure to allege an offense or federal jurisdiction. Fed. R. Crim. P. 12(b)(2), (b)(3)(B). In analyzing the charging document for such deficiencies, the Court must accept all allegations as true. United States v. Kelly, 874 F.3d 1037, 1047 (9th Cir. 2017).

An indictment must contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). It must provide enough information for the defendant to understand the charges, prepare a defense, and plead double jeopardy where appropriate. See United States v. Resendiz-Ponce, 549 U.S. 102, 108 (2007) (citation omitted). An indictment achieves this by "set[ting] forth each element of the crime that it charges." Id. at 107 (quotation omitted).

An indictment need not, however, describe the government's evidence, plead evidentiary detail, or identify all of the facts supporting the allegations. Wong Tai v. United States, 273 U.S. 77, 81-82 (1927); see also United States v. Mancuso, 718 F.3d 780, 790 (9th Cir. 2013) (indictment must contain "the essential facts necessary to apprise a defendant of the crime charged; it need not specify the theories or evidence upon which the government will rely to prove those facts" (citation omitted)). This is because "[t]he Federal Rules 'were designed to eliminate technicalities in criminal pleadings and are to be construed to secure simplicity in procedure.'" Resendiz-Ponce, 549 U.S. at 110 (quotation omitted). Therefore, an indictment may track the statutory language, or adopt other language, as long as the indictment sets forth the essential

elements of the charged offense.  Hamling v. United States, 418 U.S. 87, 117-19 (1974); see also United States v. Rodriguez, 360 F.3d 949, 958-59 (9th Cir. 2004) (indictment need not recite the exact statutory language).

When ruling on a motion to dismiss, the Court is "bound by the four corners of the indictment, must accept the truth of the allegations in the indictment, and cannot consider evidence that does not appear on the face of the indictment." Kelly, 874 F.3d at 1047. "Although the court may make preliminary findings of fact necessary to decide the legal questions presented by the motion, the court may not invade the province of the ultimate finder of fact." United States v. Nukida, 8 F.3d 665, 669 (9th Cir. 1993) (internal citations omitted).  In other words, because an "indictment either states an offense or it doesn't," a motion to dismiss cannot be used as a device for a "summary trial of the evidence." United States v. Boren, 278 F.3d 911, 917 (9th Cir. 2002) (citation omitted).

**B.    Motion to Strike**

The purpose of a motion to strike under Federal Rule of Criminal Procedure 7(d) is to protect the defendant from "prejudicial or inflammatory allegations that are neither relevant nor material to the charges." United States v. Laurienti, 611 F.3d 530, 546-47 (9th Cir. 2010) (citations omitted).  Of course, "[a]n indictment is inculpatory by nature." United States v. Gonzalez, 2018 WL 6834315, at *3 (D. Nev. Dec. 28, 2018) (citation omitted).  Thus, "[m]otions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." United States v. Daniel, 2010 WL 11507585, at *4 (C.D. Cal. 2010).  "If evidence of the allegation is

3

admissible and relevant to the charge, then regardless of how prejudicial the language is, it cannot be stricken." Id. (quotation omitted); see United States v. Terrigno, 838 F.2d 371, 373 (9th Cir. 1988) (no abuse of discretion in denying motion to strike allegations that were "somewhat prejudicial," but nonetheless "relevant and material" to the charges). Words that are "descriptive of that which is legally essential to the charge in the indictment cannot be stricken out as surplusage." United States v. Root, 366 F.2d 377, 381 (9th Cir. 1966).

Where a conspiracy is charged, allegations that relate to "the formation of the conspiracy, acts done pursuant to the conspiracy, and the effects of the conspiracy" need not be stricken as surplusage. United States v. R. P. Oldham Co., 152 F. Supp. 818, 824 (N.D. Cal. 1957); see Gonzalez, 2018 WL 6834315, at *3 ("The challenged provisions allege facts which, if proven at trial, will establish the purpose, means, and methods of the ... enterprise."). Additionally, "[l]anguage in an indictment need not be essential to the charges, but can be generally relevant to the overall scheme charged." United States v. Johnson, 262 F.R.D. 410, 414 (D. Del. 2009).

## III. DISCUSSION

### A.    The RICO Count Should Not Be Dismissed nor Fragmented

HENLEY argues that the indictment fails to allege an enterprise or pattern of racketeering activity to support a RICO conspiracy charge. (Dkt. 180.)  Likely realizing that his motion to dismiss necessarily fails because the indictment alleges each element of RICO conspiracy -- and nothing more is required by law -- HENLEY alternatively requests that the Court "strike" the overt acts

4

pertaining to HENLEY kidnapping and murdering R.W. and his following coverup, interstate transportation for prostitution, fraudulent use of wires to steal charitable donations, fraudulent mortgage application to a financial institution, and fraudulent pandemic-relief applications to the federal government. (Id. at 23-27.) Because those acts, other than R.W.'s murder, form substantive charges that are not the subject of any dismissal motion, HENLEY's true goal seems to be to exclude any evidence of those acts from his RICO trial since he simultaneously wants to sever the RICO, robbery, and extortion charges from his financial charges. (See Dkt. 181.) That is not what "striking" would accomplish, which is clear from HENLEY's citation-less request to strike the allegations, as well as the explanations below.

           1.    The RICO Count Satisfies the Form Required for Indictment and the Evidence Required for Conviction

HENLEY does not dispute that the indictment tracks the language of the RICO statute and the elements that the government must prove at trial. Accordingly, his motion to dismiss Count One should be denied. See United States v. Kaplan, 836 F.3d 1199, 1216 (9th Cir. 2016) ("An indictment is sufficient if it contains the elements of the charged crime in adequate detail to inform the defendant of the charge." (quotation omitted)); see, e.g., United States v. Cianci, 378 F.3d 71, 81 (1st Cir. 2004) ("The indictment not only tracks the language of the RICO statute, but also goes into considerable detail with respect to the underlying factual allegations. Hence, we conclude that defendants were more than sufficiently apprised of the

5

charges.").[2]  But because HENLEY uses so much space challenging the sufficiency of the evidence alleged through the indictment, the government will briefly respond in hopes of disabusing HENLEY of the notion he may obtain a favorable Rule 29 decision on these issues, while noting that this is a factual determination for a jury.

Contrary to HENLEY's protestations (Dkt. 180 at 15-18), naming the enterprise the "Big U Enterprise" violates no rule.  Associated-in-fact enterprises often are named after their leader even where companies are involved.  See, e.g., United States v. Kilpatrick, 2013 WL 4029084, at *38 (E.D. Mich. Aug. 8, 2013) (former Detroit Mayor

---

[2] HENLEY briefly claims that he is unable "to prepare a meaningful defense" because "[h]e cannot present evidence about the structure, operations, or membership of an entity that is defined solely by his own reputation."  (Dkt. 180 at 20; but see Dkt. 185 at 5 ("The Indictment in this case reads less like a neutral statement of charges and more like a sensationalized press release.").)  That claim borders on the preposterous.  The indictment is 75 pages long. It includes photos; descriptions of the defendants, victims, and even third parties; dates and locations; quoted statements; the crimes alleged, applicable statutes, and even elements; detailed modus operandi; the government's theory of the case; and even attribution. It also includes general allegations, which HENLEY for some reason complains about being absent from Count One (Dkt. 180 at 18) -- despite that they are not elements of Count One.  In any event, those were alleged as "[a]t times [being] relevant to this Indictment" (Indictment 2) consistent with United States v. Rodriguez-Gonzales, 358 F.3d 1156, 1159 (9th Cir. 2004), which only separates standalone counts, not general allegations -- that provide further notice of the government's evidence against HENLEY.  It also delineates the Big U Enterprise hierarchy and the members' relationships with one another, as HENLEY himself cites in his brief.  (Dkt. 180 at 17 & n.5.) Without regurgitating the entire indictment into its brief, the government simply invites the Court to consider its allegations, which multiple Magistrate Judges already have without problems, whether that was to find probable cause for the substantially similar complaint or to rule on various bail applications.  (See id. at 8-12 (HENLEY's detailed recounting of the allegations)); cf. Russell v. United States, 369 U.S. 749, 752, 755 (1962) (indictments were insufficient because the indictments "failed to identify the subject under congressional subcommittee inquiry at the time the witness was interrogated," despite that a "witness rightfully may refuse to answer where * * * the questions asked are not pertinent to the matter under inquiry").  Just because no "meaningful defense" exists does not mean HENLEY can dismiss the indictment.

6

Kwame Kilpatrick's trial on RICO conspiracy through the "Kilpatrick Enterprise"), aff'd, 798 F.3d 365 (6th Cir. 2015); United States v. Fiander, 547 F.3d 1036, 1038 (9th Cir. 2008) (describing "the Mahoney Enterprise" criminal organization trafficking in contraband cigarettes referring to the last name "Mahoney," despite the inclusion of an entity operated by Mr. Mahoney called "JKL Enterprises").  Nor did the government "invent[] a vague 'Big U Enterprise' to avoid ... proof problems" related to the Rollin' 60s, Developing Options, or Uneek Music.  (Dkt. 180 at 19.)  Identifying it as the "Big U Enterprise" was to put the defendants on notice that the indictment does not merely charge a gang, nonprofit, or record label indictment, despite that any of those could be in a criminal enterprise even if operating as legitimate businesses.  See Cianci, 378 F.3d at 88 ("The definitions of an enterprise in the RICO statute and the jury instructions in no way require an enterprise to include nothing but criminal actors.  To the contrary, a legitimate business, exploited by racketeers, may be an enterprise.").

Exactly as in the case HENLEY cites (Dkt. 180 at 16), the Ninth Circuit has found a RICO charge to be sufficient if it "separated defendant [George I.] Benny, an individual, from the enterprise [named George I. Benny], an association of four individuals allegedly operating under the name of one of them," United States v. Benny, 786 F.2d 1410, 1415 (9th Cir. 1986).  HENLEY, like singer R. "Kelly, a 'natural person,' is distinct from the many people at his employ who carried out his -- and his brand's -- affairs." United States v. Kelly, 128 F.4th 387, 412 (2d Cir.) (citing Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001)), cert. denied, 145 S. Ct. 2820 (2025).  Moreover, the allegations themselves, as is

common sense, demonstrate that a man in his 50s could not do it all on his own.  The enterprise that HENLEY operated with ROBINSON and co-defendant MARK MARTIN was the source of his power.  Money flowed directly through each defendant's hands -- not just HENLEY's -- and through bank accounts belonging to organizations controlled by the Big U Enterprise -- not just HENLEY's.  The fact that the Big U Enterprise's leader -- HENLEY -- profited from the racketeering activity is just as the leaders of La Cosa Nostra -- who were the impetus for enacting the RICO Act -- traditionally did.  See United States v. Feldman, 853 F.2d 648, 656 (9th Cir. 1988) ("Nor need the enterprise itself perform the illegal activity, or profit from it." (citations omitted)).

HENLEY also misguidedly devotes an entire section of his motion to a claim that the indictment violates the requirement of separately distinguishing the Big U Enterprise from racketeering activity. (Dkt. 180 at 18-19.)  The Supreme Court disagrees.  "[T]he evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" Boyle v. United States, 556 U.S. 938, 947 (2009) (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)).  In other cases, like where "several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates—for example, bribery or extortion..., [p]roof of these patterns would not be enough to show that the individuals were members of an enterprise." Id. at 947 n.4.  That is for the jury to decide.  See id. at 951 ("[P]roof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise.").  It should go without saying that,

8

of course, the government expects the jury to find that the Big U Enterprise existed upon seeing the coordination of HENLEY, ROBINSON, and MARTIN's crimes.

His arguments about the pattern of racketeering activity are even more confusing. (See Dkt. 180 at 20-23.)  The Big U Enterprise's "[c]riminal conduct form[ed] a pattern [because] it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 240 (1989) (quoting 18 U.S.C. § 3575(e)).  For example, the participants in the RICO conspiracy -- here, HENLEY, ROBINSON, and MARTIN -- are also the perpetrators of the racketeering activity. One, or some combination, of the three of them was involved in every single overt act alleged in Count One.  Likewise, they targeted the same or similar victims throughout -- namely, Victim-1 was a regular robbery and extortion target, Victim-2 was an entertainment promoter and extortion victim like Victim-1, and the donor-victims were either professional athletes or business owners who believed they were donating to charity for gang diversion through youth sports.

The "methods of commission" further link the predicate acts. Id.  With a purportedly reformed gang member at the head of the Big U Enterprise, the defendants could accomplish two goals: (1) amassing wealth through charitable donations procured for gang diversion that never reached the Crenshaw children held out as beneficiaries; and (2) amassing wealth from robberies and extortions only possible through gang-backed violence and intimidation.  Using such a powerful and connected criminal organization, the defendants were able to

further enrich themselves with fraudulently obtained loans and prostitution.

As to the Big U Enterprise's robberies, for example, in an intercepted call on March 3, 2023, HENLEY himself made explicit the modus operandi, which included robbing individuals but not taking everything from them so that they could continue to work, be robbed, identify other robbery targets, and buy the stolen items back from the Big U Enterprise.  (Indictment 20, Dkt. 81.)[3]  The Big U Enterprise employed that tactic in robbing Victim-1 personally -- almost two full years before HENLEY lay bare the modus operandi by phone -- and continued threatening that tactic throughout the recorded communications detailed in the indictment, which stretched on for years.  And as to the Big U Enterprise's fraud scheme specifically, the indictment details the intention of the donors to fund Developing Options and its alter egos' purported charitable endeavors only for HENLEY to swiftly embezzle the funds for his own personal use.  (Id. at 30-31.)  The foregoing examples of the commonalities refute HENLEY's mischaracterization of the acts as "isolated, disconnected events."  (Dkt. 180 at 7.)

The indictment also sufficiently demonstrates continuity. Predicate acts occurring over "thirteen months ... would have demonstrated that the criminal activity spanned a 'substantial period of time' and, therefore would have satisfied the continuity requirement" as "closed-ended continuity."  Allwaste, Inc. v. Hecht,

---

[3] The government's citations to the indictment equally apply to the first superseding indictment returned on February 19, 2026, which did not change the landscape of any pretrial motion, as will be evident from the government's forthcoming notice of the first superseding indictment.

65 F.3d 1523, 1527-28 (9th Cir. 1995).  Here, the specifically alleged overt acts alone continued at least from August 2019 (with the donation-related wire fraud) through April 2023 (with the instruction to send an extortionate message to a marijuana dispensary owner), not to mention HENLEY's obstruction on March 19, 2025.  (See Indictment 28, 30, 40-41.)  Additionally, the Ninth Circuit has "found open-ended continuity" where "there were only two predicate acts in a twelve month span" because of "a threat of continuity." Allwaste, 65 F.3d at 1529 (citation omitted).  On that point, even HENLEY acknowledges the continuity of the types of predicate acts, namely that the robberies and extortions continued from 2021 through 2023 and the fraud continued from 2019 through 2023.  (Dkt. 180 at 22.)  HENLEY's last gripe on continuity is that his criminal activity would not have continued past his "arrest" on March 19, 2025,[4] absent law enforcement intervention because the last alleged extortion and fraud were in 2023.  (Id. at 23.)  He does not cite any authority for that grievance, nor does he acknowledge all the allegations, including on March 19, 2025, of defendant trying to thwart the investigation of his crimes.

       2.   HENLEY's Racketeering Activity Is Not "Surplusage"

HENLEY also argues that his crimes of kidnapping, murder, interstate transportation for prostitution, wire fraud, and bank fraud should be stricken as "surplusage."  (Dkt. 180 at 23-24.)  Like his dismissal argument, which would require weighing the evidence,

---

[4] Characterizing this as an "arrest" is absurd.  As clearly set forth in the indictment, HENLEY was tipped off about the planned arrest, fled, kept his phones and location data from law enforcement, attempted to poison the jury pool and intimidate and dissuade cooperators via social media, and only afterwards surrendered. (Indictment 40-41.)

11

this request requires evaluating the prejudicial impact of evidence -- a trial determination.  And each of the crimes is "racketeering activity" as defined by 18 U.S.C. § 1961(1).  At trial, the government must prove that HENLEY, ROBINSON, and MARTIN knowingly and intentionally agreed and conspired with others to conduct or participate, directly or indirectly, in the affairs of an enterprise through a pattern of racketeering activity.  See Boyle, 556 U.S. at 946.  HENLEY's commission of racketeering activity is as relevant as evidence gets.  Cf. United States v. Banks, 514 F.3d 959, 977 (9th Cir. 2008) ("Because one element of VICAR is membership in a racketeering organization, this evidence of other wrongful acts was directly relevant to establishing an element of the charged offense."); United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) (evidence of uncharged acts of extreme violence by members of a RICO enterprise "was certainly probative of the existence of the charged enterprise").

HENLEY argues that his murder of R.W. "presents a personal affront narrative," rather than overt acts in furtherance of the RICO conspiracy.  (Dkt. 180 at 24.)  He is certainly welcome to assert that defense at trial if he wishes, but he cannot avoid that the indictment alleges HENLEY kidnapped and murdered R.W. because "HENLEY Believed [R.W.] Had Disrespected the Big U Enterprise."  (Indictment 12.)  "[D]iscipline" for "disrespecting the Big U Enterprise or its members, including through threats and acts of violence such as assault, kidnapping, and murder" is part of the alleged means and methods of the Big U Enterprise.  (Id. at 9.)  The Supreme Court has acknowledged that RICO enterprises may, but need not necessarily, have "disciplinary procedures."  Boyle, 556 U.S. at 948.  And having

a personal motive does not preclude a RICO conspiracy conviction. See, e.g., United States v. Farmer, 38 F.4th 591, 603-04 (7th Cir. 2022) (finding "overwhelming evidence" of RICO conspiracy despite a defendant's claim that "he robbed and shot [the victim] of his own volition and unrelated to his involvement with the Latin Kings" gang); United States v. Capers, 20 F.4th 105, 114-15 (2d Cir. 2021) (finding sufficient evidence "that the murder ... was part of the pattern of racketeering activity to which [the defendant] agreed," as part of his RICO conspiracy conviction, because "nothing about [his] additional motive [of personal friendship] is inconsistent with the conclusion, which could rationally be drawn from the evidence, that [the defendant] was loyal not only to [his friend] personally, but to the gang that [his friend] led"); United States v. White, 7 F.4th 90, 101 (2d Cir. 2021) ("[A] defendant's personal motive for committing an act of violence does not preclude his [VICAR] conviction under § 1959 as long as he likewise was motivated by a desire to increase or maintain his position in the RICO enterprise.").

He also argues that the murder-related overt acts lack venue or jurisdiction, which demonstrates a fundamental misunderstanding of the law.  (Dkt. 180 at 25-26.)  This Court has venue over the RICO conspiracy because the Big U Enterprise was formed and operated in this District.  See 18 U.S.C. § 3237 (venue where offense began, continued, or was completed); cf. United States v. Rodriguez-Moreno, 526 U.S. 275, 281-82 (1999) (a conspiracy with overt acts in multiple districts takes place in multiple districts, even if only one overt act would be necessary to sustain a conviction).  This Court also has jurisdiction over the RICO conspiracy charge because the Big U Enterprise had at least a minimal effect on interstate or foreign

commerce.  See United States v. Rone, 598 F.2d 564, 573 (9th Cir. 1979).  For example, as alleged in the indictment and unchallenged by any of the 16 pretrial motions filed in this case, the Big U Enterprise received extortion payments from businesses operating in interstate commerce.  Each predicate act need not affect commerce itself.  See id.

Regarding the prostitution allegations, HENLEY complains that "[i]n the absence of a linkage to the enterprise's objectives, these acts are immaterial to the charged pattern and risk confusing the issues with inflammatory sexual content."  (Dkt. 180 at 26.)  Like his kidnapping and murder of R.W., HENLEY is welcome to argue to the jury that he committed interstate transportation for prostitution, for his own enjoyment, and not on behalf of the Big U Enterprise, if he wants.  But the alleged "purposes of the Big U Enterprise" specifically included "[g]ratifying Big U Enterprise members and associates by trafficking and exploiting sex workers."  (Indictment 6); see, e.g., United States v. Bingham, 653 F.3d 983, 993 (9th Cir. 2011) (determining that "a rational juror could find beyond a reasonable doubt that the [Aryan Brotherhood prison gang] remained the same criminal enterprise" and "operated various criminal schemes involving prostitution, theft, extortion, gambling, and drugs").  Indeed, the enterprise's operation is alleged to have subsisted on defendant's ability to provide members and affiliates with benefits other than money -- such as employment at Developing Options, bank loans based on that employment, and sexual activity with sex workers he procured.  And, unfortunately for HENLEY, interstate transportation for prostitution in violation of 18 U.S.C. § 2421 is racketeering activity under 18 U.S.C. § 1961(1).

14

Finally, HENLEY seeks to strike the overt acts pertaining to his fraudulent loan applications -- first to the Small Business Administration for pandemic relief and then to a financial institution for his employee's mortgage -- as "[d]etached from the enterprise's robbery and extortionate schemes" and "operations." (Dkt. 180 at 26-27.)  Like the other overt acts he has no defense against, these are predicate racketeering activities under 18 U.S.C. § 1961(1).  They are linked to both the purposes and the manner and means of the Big U Enterprise allegations.  (See Indictment 6, 9.)

HENLEY does not cite any authority -- because the opposite exists -- limiting RICO conspiracies to robbery and extortion.  See, e.g., United States v. Zemek, 634 F.2d 1159, 1162-63 (9th Cir. 1980) (RICO trial involving "acts and threats of murder, arson and bribery (in violation of state law) and gambling, mail fraud, extortion and obstructing communication to criminal investigators (in violation of federal law)"); United States v. Bibbero, 749 F.2d 581, 587 (9th Cir. 1984) ("A single conspiracy may involve several subagreements or subgroups of conspirators.").  Congress expressly proscribed racketeering activity ranging from murder to trafficking in contraband cigarettes.  See 18 U.S.C. § 1961(1).  The government properly alleged the Big U Enterprise's predicate acts falling under the statutory definition of "racketeering activity."  Striking those allegations -- and, worse, excluding that evidence -- would be reversible error.[5]  See United States v. DiCesare, 765 F.2d 890, 900

---

[5] In his "LAW" section, HENLEY cites two cases purportedly giving this Court "the discretion to strike RICO predicate acts that are surplusage."  (Dkt. 180 at 12-13.)  But those cases do no such thing.  In the first, the Ninth Circuit made the unremarkable statement that "[t]o the extent that the allegations ... do not
*(footnote cont'd on next page)*

15

(9th Cir.) ("The existence of separate conspiracies is a question of fact, not of law, to be determined by the jury." (citation omitted)), amended, 777 F.2d 543 (9th Cir. 1985).

### 3. HENLEY Cannot Strike the Control Tactics He Employed for the Success of His Enterprise

HENLEY argues that the alias "Anybody Killa" is prejudicial surplusage suggesting "a propensity for indiscriminate violence." (Dkt. 185 at 6.) "Even if the use of [a] word ... could be considered prejudicial," however, a court does "not abuse its discretion" in denying a motion to strike where "the allegation was relevant." Laurienti, 611 F.3d at 547 (citations omitted). HENLEY calls himself "Anybody Killa" in recordings that the government will seek to introduce at trial, including in an intercepted call described in an overt act that HENLEY does not seek to strike. That self-proclaimed alias is certainly relevant to his method of control: instilling fear. Because the jury will hear HENLEY refer to himself as "Anybody Killa," including that alias in the indictment cannot be prejudicial. Cf. United States v. Gerlay, 2009 WL 3872143, at *1 (D. Alaska Nov. 17, 2009) ("If language in the indictment constitutes

qualify as overt acts supporting the conspiracy count, they are simply surplusage" that "may be subject to a motion to strike." United States v. Fernandez, 388 F.3d 1199, 1220 (9th Cir. 2004), modified, 425 F.3d 1248 (9th Cir. 2005). It did not weigh in on whether the allegations were surplusage or predicate acts. In the second case, a district court struck allegations in a civil complaint that it determined were immaterial and impertinent and reflected "negatively upon the character of individuals and entities which are and are not parties to this suit." Does 1-60 v. Republic Health Corp., 669 F. Supp. 1511, 1515 (D. Nev. 1987). There is no appellate history listed for the case, nor does that district court cite any authority for striking alleged predicate acts in RICO cases. Moreover, unlike civil cases, "[t]here is no summary judgment procedure in criminal cases. Nor do the rules provide for a pre-trial determination of sufficiency of the evidence." United States v. Critzer, 951 F.2d 306, 307 (11th Cir. 1992) (per curiam).

16

information that the government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be as long as the information is legally relevant." (citation omitted)); United States v. Redlightning, 624 F.3d 1090, 1121 (9th Cir. 2010) (citing cases for the proposition that any error in admitting evidence for one purpose is harmless where the evidence is properly admissible for another purpose).

HENLEY also argues that the screenshot "depicting [HENLEY] unsmiling and serious-faced" has an "awkward, unnecessary, and inflammatory" placement without "connection to any specific overt act, to identify (which is not disputed), or to any element of any charge." (Dkt. 185 at 6.) His contention ignores that the indictment identifies that "image" as coming from HENLEY's recording of a film crew in Los Angeles's Hyde Park neighborhood in or around 2017, in which HENLEY claimed, "Anytime you want to do movies in the hood, just check it in ..., but if you don't check it in, we going to check you in alright.... We going to check in all your equipment." (Indictment 8.) That "check in" procedure is specifically alleged to be "part of the Big U Enterprise's purported 'control' of Los Angeles," as HENLEY explains in his "Checc'n In" podcast and documentary film, clips from both of which will be introduced at trial. (Id. at 7-8.) Additionally, because the government will be introducing the video from which the challenged image comes, its inclusion in the indictment cannot be prejudicial. Cf. Gerlay, 2009 WL 3872143, at *1; Redlightning, 624 F.3d at 1121.

4.    The Jury Should See the Indictment Themselves

Because HENLEY is asking this Court to pick apart the indictment to avoid its "prejudicial" signaling "to the jury" (see, e.g., Dkt.

185 at 6), once the Court has resolved the issues, the government requests that the jury receive a copy of the indictment for their deliberations with the standard instruction that the indictment is not evidence, see, e.g., United States v. Steed, 465 F.2d 1310, 1316 (9th Cir. 1972) (no abuse of discretion or due process violation to send the indictment back with the jury for deliberations); United States v. Utz, 886 F.2d 1148, 1151-52 (9th Cir. 1989) (same to give each juror their own copy of the indictment).  Indeed, trial judges have discretion to submit an indictment to a jury so long as limiting instructions are given to the effect that an indictment is not to be considered as evidence of the guilt of the defendant.  See Shayne v. United States, 255 F.2d 739, 743 (9th Cir. 1958) ("The matter of sending the indictment and exhibits to the jury is a matter entirely in the discretion of the trial court.").  Trial indictments can be helpful "to aid the jury in organizing the proof."  United States v. Scales, 594 F.2d 558, 562 (6th Cir. 1979); see United States v. Polizzi, 500 F.2d 856, 876 (9th Cir. 1974) (in lengthy, complex Travel Act prosecution, providing indictment to jury was within direction of trial judge, especially given "the court's cautionary instruction on the use of the indictment and information and the detailed instructions on what could be considered evidence by the jury").

**B.    Drug Robberies Are Federal Crimes**

HENLEY also moves to dismiss Counts Two and Three on the argument that this Court lacks jurisdiction over robberies of unlicensed marijuana dispensaries operating locally.  (Dkt. 188.)  As he concedes, however, his motion is foreclosed by binding precedent since "[i]n order to obtain a conviction under the Hobbs Act for the

robbery or attempted robbery of a drug dealer, the Government need not show that the drugs [or drug proceeds] that a defendant stole or attempted to steal either traveled or were destined for transport across state lines" because "as a matter of law, the market for illegal drugs is 'commerce over which the United States has jurisdiction.'"  Taylor v. United States, 579 U.S. 301, 309 (2016); see also United States v. Woodberry, 987 F.3d 1231, 1235 (9th Cir. 2021) ("[A] robbery of a licensed marijuana dispensary falls within the same category of conduct that the Court addressed in Taylor ... [r]egardless of the fact that some states have legalized marijuana for purposes of their state laws.").  Nevertheless, he argues that Taylor "should not be extended to the facts of this case," claiming that this unlicensed dispensary "does not participate in the lawful interstate market, does not use out-of-state suppliers, and does not move goods across state lines is a purely local crime."  (Dkt. 188 at 7.)  Even if the facts as to the unlicensed dispensary were true -- which the government does not concede -- that argument would still fail because, as just discussed, Taylor applies to any drug robbery.

The government also notes that HENLEY's arguments are so self-contradictory to be frivolous.  In another motion, he characterizes Victim-1, who operated the dispensary HENLEY robbed, "as a sophisticated international trafficker."  (HENLEY's Mot. to Suppress Intercepted Communications 1 (filed under seal via notice of errata on Feb. 9, 2026).)  Now, HENLEY argues his marijuana operation was purely local with no interstate connections.  HENLEY cannot have it both ways.  These contradictory positions expose the motions for what they are: throwing everything at the wall to delay or avoid trial.

**C.   ROBINSON, Not the Government, Committed RICO Conspiracy, Robbery, and Extortion**

ROBINSON moves to dismiss the RICO, robbery, and extortion counts against him for his imagined "[o]utrageous government misconduct" -- essentially that Victim-1 victimized himself just to drum up charges against HENLEY, ROBINSON, and MARTIN.  (Dkt. 175 at 4.)  In truth, it is not the government's conduct that is outrageous, but the motion itself by inverting reality.  The defendants robbed Victim-1, then spent years extorting him.  When he reported these crimes and agreed to record their ongoing threats, the defendants didn't stop -- they kept extorting him, kept threatening him, and kept discussing their other criminal activities on recorded lines. ROBINSON now asks this Court to reward this conduct by dismissing the charges.  The answer is no.  Indeed, the motion is so outlandish that it appears to have just been filed to publicly smear a victim-witness before trial, but the government will nevertheless respond.

"Outrageous government conduct occurs when the actions of law enforcement officers or informants[6] are 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'"  United States v. Black, 733 F.3d 294, 302 (9th Cir. 2013) (quotation omitted).  "Dismissing an indictment for outrageous government conduct, however, is limited to extreme cases in which the defendant can demonstrate that the government's conduct violates fundamental fairness and is so grossly shocking and so outrageous as to violate the universal sense of

---

[6] Although Victim-1 informed the government about the defendants' crimes, he was their victim (unlike a "CI" posing as a customer or a "UC" posing as a co-conspirator).

20

justice." Id. (cleaned up). A defendant seeking dismissal for outrageous government conduct must satisfy an "extremely high standard." Id. (quotation omitted). The Ninth Circuit considers the following factors in assessing such requests:

> (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.

Id. at 303. None of the factors support dismissal in this case. First, the enterprise existed years before any cooperation, as the indictment alleges. (Indictment 18-19, 28, 31, 38.) Second, Victim-1's role was entirely passive -- he reported a robbery and consented to recordings. He didn't initiate, plan, or facilitate any criminal conduct. Third, consensual recording is classic investigative technique to "ferret out" notoriously difficult-to-prove extortion crimes. Fourth, Victim-1 didn't infiltrate an organization -- he was victimized by it and then provided information about it to law enforcement. Fifth, the defendants approached Victim-1 and robbed him before any cooperation with Los Angeles-based agents began; they were already engaged in the charged conduct.

Where, as here, "the government did not initiate the criminal activity, but rather sought to crack an ongoing operation, its conduct was not outrageous and did not violate due process." United States v. Gurolla, 333 F.3d 944, 950 (9th Cir. 2003). Indeed, as discussed above, the overt acts specifically alleged in this case date back to August 2019, years before the charged crimes against Victim-1 in 2021, and they continued after the final recorded

21

extortion on March 29, 2023.  (See Indictment 28, 31, 38.)  All Victim-1 did was report the robbery of his store and consent to wearing a recording device and to his calls being recorded, which developed damning evidence of extortion crimes that are traditionally difficult cases.  See, e.g., United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Const. Trades Dep't, AFL-CIO, 770 F.3d 834, 838 (9th Cir. 2014) (acknowledging that distinguishing between hard bargaining and extortion can be difficult); Chandler v. Amsberry, 2014 WL 1323048, at *9 (D. Or. Mar. 28, 2014) (discussing evidence that sex offenders generally do not report being extorted to prison officials); United States v. Diaz, 248 F.3d 1065, 1076 (11th Cir. 2001) (victims "did not report the kidnapping and extortion to the police for fear of their children's lives").

And ROBINSON's claim "that two of the most serious crimes in the indictment, specifically robbery and extortion, had nothing to do with anyone or anything except [Victim-1] and his own business ventures" could not be more wrong.  (Dkt. 175 at 10.)  HENLEY, ROBINSON, and/or MARTIN also talked about extorting Victim-2, an individual working on HENLEY's vehicle, a store owner who refused to provide HENLEY a discount, and "motherfuckers" in Jordan Downs. (Indictment 35-36, 38.)  On intercepted calls having nothing to do with Victim-1, HENLEY talked about collecting robbery proceeds from Zihirr Mitchell, also known as "Bricc Baby," using ROBINSON and their co-defendant FREDRICK BLANTON, JR.  (Id. at 19-20.)  HENLEY's description of the Big U Enterprise's robbery modus operandi applied to individuals (plural), rather than just Victim-1, and he even talked about other extortion victims with Victim-1.  (Id. at 20-22.)

22

Throughout his motion, ROBINSON attacks Victim-1 as a drug and sex trafficker and remarks that "[t]here is zero evidence that Robinson was involved in any of this activity before [Victim-1] showed up on the scene." (Dkt. 175 at 7.) But ROBINSON is not charged with drug or sex trafficking,[7] so even if Victim-1 "involved" ROBINSON in those crimes, ROBINSON cannot say that "the government[] encourage[d] the defendants to commit the offense conduct" or even that "the government[ had a] role in creating the crime of conviction." Black, 733 F.3d at 303 (emphasis added). Even if ROBINSON's characterization of Victim-1 "staging" HENLEY's birthday party (Dkt. 175 at 9) where the Big U Enterprise extorted Victim-2 (Indictment 28-29) could be taken as true, it would at most amount to "[g]overnment agents ... 'provid[ing] valuable and necessary items to the venture,'" and his motion would still fail because the defendants were "intimately involved in the development of the plan." United States v. Williams, 547 F.3d 1187, 1201 n.11 (9th Cir. 2008) (quotation omitted).

"There is no evidence that the government 'engineer[ed] and direct[ed] the criminal enterprise from start to finish,' as required to establish this defense." United States v. Bonanno, 852 F.2d 434, 438 (9th Cir. 1988) (citation omitted). Accordingly, ROBINSON's motion fails.[8]

---

[7] The fact that the government did not set up controlled buys with the defendants further defeats ROBINSON's argument; if the government was pulling the strings, it certainly would not forgo an easy case with mandatory minimum sentences and high Guidelines calculations. Compare 18 U.S.C. § 1951(a), with 21 U.S.C. § 841(b)(1)(A); compare U.S.S.G. § 2B3.1, with U.S.S.G. § 2D1.1.

[8] ROBINSON makes other factually inaccurate statements that are not pertinent to his motion but still demand a response. Victim-1 had only been cooperating on unrelated matters before he reported the
*(footnote cont'd on next page)*

23

## IV.   CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny the motions to dismiss and/or strike portions of the indictment.

---

defendants to law enforcement.  (Cf. Dkt. 175 at 4.)  Victim-1 was merely the broker for cocaine and methamphetamine deals, not a source of supply, and simply shipped marijuana across state lines.  (Cf. id. at 6-7.)  While the complaint charging the drug trafficking organization uses the word international -- once -- the indictment does not, and neither the complaint nor the indictment asserts that any member of the organization ever trafficked narcotics internationally.  Nor did the government consent to him trafficking drugs, beyond his marijuana dispensary for which HENLEY now asserts HENLEY and ROBINSON were the suppliers.  (Compare id. at 8, with HENLEY's Mot. to Suppress Intercepted Communications 16 (filed under seal via notice of errata on Feb. 9, 2026).)  ROBINSON may not have any convictions for drug use or trafficking, but he was previously arrested for possession of a narcotic controlled substance in violation of California Health and Safety Code § 11350(a).  (Cf. Dkt. 175 at 8.)  The government never conceded that the defendants' crimes "did nothing to benefit" the Rollin' 60s.  (Cf. id. at 9.)  HENLEY, MARTIN, and WILLIAMS all claim to be Rollin' 60s members and all benefited from the crimes charged here.  Finally, Victim-1 was not "seeking protection from his very real enemies who were upset because he failed to pay them in a timely fashion for the drugs he sold with the permission of the Federal Government," which does not even make sense because why would he owe money as the drug dealer or owe money period if the government was funding the operation?  (Cf. id. at 9-10.)

24

The undersigned, counsel of record for plaintiff United States of America, certifies that this brief contains 6,998 words, which complies with the word limit of L.R. 11-6.1. and the word limit set by the Court's standing order dated October 1, 2024.


Dated: February 19, 2026          Respectfully submitted,

                                  TODD BLANCHE
                                  Deputy Attorney General

                                  BILAL A. ESSAYLI
                                  First Assistant United States
                                  Attorney

                                  ALEXANDER B. SCHWAB
                                  Assistant United States Attorney
                                  Acting Chief, Criminal Division


                                  _____/s/_____
                                  KEVIN J. BUTLER
                                  JENA A. MACCABE
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

25